1    IN THE UNITED STATES DISTRICT COURT
     DISTRICT OF COLORADO
2
     Case No. 2020-CV-01194-DDD-KMT
3    _____

4    VIDEO-CONFERENCE DEPOSITION OF HAMKIM, INC., D/B/A VISTA INN
     30(B)(6) CHRIS CROSIER  JUNE 17, 2021
5    _____

6    HAMKIM, INC., D/B/A VISTA INN,

7    Plaintiff,

8    vs.

9    AMGUARD INSURANCE COMPANY,

10   Defendant.

11   _____

12

13        PURSUANT TO NOTICE AND AGREEMENT, the deposition of

14   HAMKIM, INC., D/B/A VISTA INN 30(b)(6) CHRIS CROSIER, was

15   taken via video conferencing per stipulation of all parties

16   on behalf of the Defendant Thursday, June 17, 2021,

17   commencing at 9:33 a.m., before Christian Rennahan-Mayo,

18   Certified Shorthand Reporter and Notary Public within and

19   for the State of Colorado.

20

21

22

23

24

25    Job No. 760772

**EXHIBIT A**

CHRIS CROSIER, 30(B)(6) OF HAMKIM, INC. - 06/17/2021

```
                                                              Page 2
 1                        A P P E A R A N C E S

 2
      (VIA VIDEO)
 3    For the Plaintiff:        MICHAEL Y. KIM, ESQ
                                THE MICHAEL KIM LAW FIRM, PLLC
 4                              7700 East Arapahoe Road
                                Suite 255
 5                              Centennial, Colorado  80112
                                (303) 569-8288
 6                              mkim@mkimlegal.com

 7

 8    (VIA VIDEO)
      For the Defendant:        LAURA J. ELLENBERGER, ESQ
 9                              WILSON, ELSER MOSKOWITZ, EDELMAN &
                                DICKER, LLP
10                              1225 17th Street
                                Suite 2750
11                              Denver, Colorado  80202
                                (303) 572-5300
12                              laura.ellenberger@wilsonelser.com

13

14

15

16

17

18

19

20

21

22

23

24

25
```

**EXHIBIT A**

CHRIS CROSIER, 30(B)(6) OF HAMKIM, INC. - 06/17/2021

Page 3

```
 1                        I N D E X

 2    EXAMINATION OF CHRIS CROSIER              PAGE
      JUNE 17, 2021
 3

 4    MS. ELLENBERGER                            6

 5    MR. KIM                                   --

 6

 7

 8
      DEPOSITION EXHIBITS:                INITIAL REFERENCE
 9
      Exhibit 1   Notice of FED.R.CIV.P.30(b)(6)       16
10                Deposition of Plaintiff HamKim, Inc.
                  D/B/A Vista Inn By Videoconference
11
      Exhibit 2   Copies of Checks (VistaInn000264 - 269)  36
12
      Exhibit 3   Berkshire Hathaway Guard Insurance      49
13                Companies BOP Survey Assignment
                  (AMGUARD 001319 - 001332)
14
      Exhibit 4   Photographs (AMGUARD 001809 - 001837)   55
15
      Exhibit 5-1 May 19, 2021, E-mail With Attachments   73
16                (AMGUARD 002325 - 003339)

17    Exhibit 5-2 June 29, 2017 E-mail                   76

18    Exhibit 6   Pueblo Regional Building Department      84
                  7-19-17 Miscellaneous Receipt
19                (AMGUARD 001369 - 001370)

20    Exhibit 7   Pueblo Regional Building Department      87
                  Inspection Permits (AMGUARD 001339 - 001347)
21
      Exhibit 8   Pueblo Regional Building Department      92
22                Building Permit (AMGUARD 001348)

23    Exhibit 9   Pueblo Regional Building Department      95
                  Building Permit (AMGUARD 001351 - 1352)
24
      Exhibit 10  January 24, 2018, E-mail with Attachments  96
25                (AMGUARD 002620 - 002631)
```

**EXHIBIT A**

CHRIS CROSIER, 30(B)(6) OF HAMKIM, INC. - 06/17/2021

Page 49

1        (Short break taken.)

2    BY MS. ELLENBERGER:

3        Q    Okay.  Mr. Crosier, are you ready to go?

4        A    Yes, ma'am.

5        Q    Before the break we were talking about LKK

6    Roofing's work to perform repairs on the roof of the

7    property, the Vista Inn, in 2017.  Other than what's

8    indicated on those invoices, do you have any information to

9    what was actually repaired by LKK Roofing?

10       A    No, ma'am.

11       Q    Do you know which areas of the roof were repaired?

12       A    It appears, according to the documentation, to be

13   the west and east side of the building and then the north

14   side of the building.

15       MS. ELLENBERGER:  Okay.  Let's mark this as Exhibit

16   No. 3.

17       (Deposition Exhibit 3 was marked.)

18   BY MS. ELLENBERGER:

19       Q    Are you able to see the screen?

20       A    I am.

21       Q    Okay.  This is AmGUARD Bates label 1319 through

22   1332.  I am just going to scroll down to the -- well, I will

23   stay on the first page.

24       Mr. Crosier, have you ever seen this document before?

25       A    No.

**EXHIBIT A**

CHRIS CROSIER, 30(B)(6) OF HAMKIM, INC. - 06/17/2021

Page 50

1    Q    Okay.  I will scroll down to the third page.
2  At -- at the top it says "Package policy survey report," and
3  the date surveyed as indicated by my highlighting there is
4  April 13th, 2017.
5       Do you see where I have highlighted that?
6    A    I do.
7    Q    And then it says -- where I have highlighted here
8  in the middle of the page, it says "Person interviewed,
9  Charles Howard and Pete Soto."
10   A    Okay.
11   Q    Who are Charles Howard and Pete Soto?
12   A    Charles Howard is the previous AGM, and Pete Soto
13  was a housekeeper.
14   Q    Were you employed by HamKim at this time on April
15  13th, 2017?
16   A    I don't believe so.  I think I came in to it later
17  on in that month.
18   Q    So you weren't personally involved in this survey
19  or this interview?
20   A    No.
21   Q    Okay.  We're now on Page 4 of this document, and I
22  will make it a bit bigger for you.  It says at the top -- I
23  am getting some feedback again.  We can go keep going.  It
24  says at the top here under "Description of Operation The
25  Great Stay Inn is located behind the Clarion Inn, and Kevin

**EXHIBIT A**

CHRIS CROSIER, 30(B)(6) OF HAMKIM, INC. - 06/17/2021

Page 51

1    Him purchased both of those properties in February of 2017."

2         Do you see where I read that?

3    A    Sorry.  Say again.

4    Q    Do you see where I read that at the top here?

5    A    Yes.

6    Q    It goes on to say "Mr. Kim previously owned a

7    La Quinta Inn for five years.  Pete Soto" --

8    A    Right.

9    Q    Okay.  It says "Pete Soto, his manager, has worked

10   at the motel for over 20 years, except that he took a short

11   time -- except for the short time he took a position

12   elsewhere."

13        Do you see where I read that?

14   A    I do.

15   Q    So was Pete Soto a housekeeper, or was he a

16   manager for the motel for over 20 years?

17   A    Pete Soto was a housekeeper.  When I was there in

18   2007, he was a housekeeper.  His duties were -- at the

19   Clarion he dealt with common areas, vacuuming, emptying

20   trash, stuff like that, and exteriorwise, he picked up trash

21   in the parking lots.  At no time -- and when I came on board

22   in 2017, he was still in that role.

23   Q    So do you have any understanding as to why he is

24   designated as the manager in this document?

25   A    I -- no.  There's no reason for him to be.  He has

**EXHIBIT A**

CHRIS CROSIER, 30(B)(6) OF HAMKIM, INC. - 06/17/2021

Page 52

1   never been a manager --

2       Q    Okay.

3       A    -- to my knowledge.

4       Q    In the next -- in the following sentence it says

5   "The general manager, Charles Howard, was also interviewed,"

6   and you indicated that Charles Howard was the previous AGM

7   before you; right?

8       A    No.  He was the previous GM before me.  I was the

9   AGM.  I replaced Charles Howard.

10      Q    When did Charles Howard leave?

11      A    Spring of 2018.

12      Q    Okay.  It goes on.  I don't want to read all of

13  this, but if you look at the third paragraph here that I've

14  highlighted, it says "All the rooms are being remodeled."

15      Is that true, that in April of 2017 all of the rooms at

16  the Vista Inn were being remodeled?

17      A    It was not happening when I was there.

18      Q    So this is an untrue statement?

19      MR. KIM:  Objection.

20  BY MS. ELLENBERGER:

21      Q    Inaccurate statement?

22      MR. KIM:  Objection as to form.

23      THE WITNESS:  I -- I can't speak to that.  I can only

24  speak to when I was there.  So what they were doing before I

25  got there, I don't know.

**EXHIBIT A**

CHRIS CROSIER, 30(B)(6) OF HAMKIM, INC. - 06/17/2021

Page 53

1   BY MS. ELLENBERGER:

2       Q    You understand that you're testifying as a

3   representative on behalf of HamKim, Inc., today; right?

4       A    I do.

5       Q    And that one of the -- one of the topics that was

6   noticed as a topic for discussion today was the condition of

7   the property when it was purchased; is that right?

8       A    Correct.

9       Q    Did you do anything to educate yourself as to the

10  condition of the property when -- condition of the property

11  at the time it was purchased?

12      A    Could you say that again for me?

13      Q    Sure.

14      Did you speak to anyone, Charles Howard or Mr. Kim,

15  regarding the condition of the property at the time that it

16  was purchased in preparation for your deposition today?

17      A    No.

18      Q    Why not?

19      A    I am assuming that because -- when I started in

20  late April, because there was nobody back there and that was

21  part of what I was doing, that the condition that I

22  witnessed is what it was in.

23      Q    Okay.  So between April -- I think this is '17.  I

24  can go back up.  Hold on.  Let me make sure that is correct.

25  Sorry.  April 13th, I am sorry, of 2017, and then when did

**EXHIBIT A**

CHRIS CROSIER, 30(B)(6) OF HAMKIM, INC. - 06/17/2021

Page 54

1    you start?

2        A    Later that month.  I -- it would have been the

3    last week or so of April.

4        Q    Okay.  So between April 13th and late April when

5    you started, it's your understanding that no repairs were

6    made to the property in that interim period?

7        A    Correct.

8        Q    Okay.  It goes on to say "The office of The Great

9    Stay Inn is still under renovation.  So guests are directed

10   to the Clarion for check-in.  It should be ready shortly."

11       Is the office of The Great Stay Inn ready today for

12   guests to check in at the Vista Inn -- or I am sorry -- the

13   Great Stay Inn?

14       A    That entire -- yes.  The Great Stay was never not

15   under renovation.  That lobby was renovated in 2007, and

16   that's how it stands today.  So there's a difference between

17   when they finished constructing that -- when they finished

18   remodeling that building in 2007 to turn it into a Howard

19   Johnson as it stands today, including the lobby.

20       Q    Is the lobby of the Vista Inn currently used as a

21   guest check-in site?

22       A    No.

23       Q    Why not?

24       A    We use everything at the Clarion.

25       Q    Okay.  But why is the -- why is there no guest

**EXHIBIT A**

CHRIS CROSIER, 30(B)(6) OF HAMKIM, INC. - 06/17/2021

Page 55

```
 1   check-in at The Great -- or at the Vista Inn?

 2        A    Efficiency.

 3        Q    Is that lobby area of the Vista Inn maintained?

 4        A    We go in there weekly and vacuum and dust and make

 5   sure everything is good.

 6        MS. ELLENBERGER:  Okay.  I am going to mark -- are we

 7   on Exhibit 4?

 8        THE REPORTER:  Yes.

 9        (Deposition Exhibit 4 was marked.)

10   BY MS. ELLENBERGER:

11        Q    Mr. Crosier, are you able to see this photo?

12        A    That's -- that's the Vista lobby.

13        Q    Let's -- so this page -- this is a 29-page

14   document, and the Bates labels are AmGUARD 1809 through 1837

15   marked as Exhibit 4, photos of the lobby of the Vista Inn.

16   This is another photo of the lobby of the Vista Inn.

17        MR. KIM:  What did you say that start Bates was?

18        MS. ELLENBERGER:  It's 1809 through 1837.

19        MR. KIM:  Thank you.

20   BY MS. ELLENBERGER:

21        Q    So this is the lobby of the Vista Inn; correct,

22   Mr. Crosier?

23        A    Right.

24        Q    Did I say that -- okay.  This is another photo of

25   the lobby of the Vista Inn.
```

**EXHIBIT A**

CHRIS CROSIER, 30(B)(6) OF HAMKIM, INC. - 06/17/2021

Page 56

1        Do you see that water mark in the ceiling?

2        A    I can't say that's from the Vista, but I see the

3    water mark.

4        Q    Do you see this water mark in the lobby of the

5    Vista Inn?

6        A    I see the water mark.  I don't know whether it's

7    from the Vista.  I can't tell because there's no background

8    on it.

9        Q    Is this the lobby of the Vista Inn?

10       A    It is.

11       Q    Okay.  That's Page 4.  Now on Page 5, is this also

12   the lobby of the Vista Inn?

13       A    It is.

14       Q    And Page 6, is this the lobby?

15       A    It is.

16       Q    Page 7, is this the lobby of the Vista Inn?

17       A    It is.

18       Q    Okay.  Page 8, is this the lobby as well?

19       A    It is.

20       Q    Is this the closet in the lobby of the Vista Inn?

21       A    It's a bathroom, but yes.

22       Q    Is this the bathroom of that area?

23       A    It's one of the three there, yes.

24       Q    And is this bathroom -- does this show that this

25   bathroom is being maintained?

**EXHIBIT A**

CHRIS CROSIER, 30(B)(6) OF HAMKIM, INC. - 06/17/2021

Page 57

1      A    It's being used for storage.

2      Q    Is this also -- this Page 10, is this a photo of

3   the lobby of the Vista?

4      A    Yes.

5      Q    Is this another -- this is Page 11.  Is this a

6   photo of the lobby -- or of the bathroom in the lobby of the

7   Vista Inn?

8      A    That's one of them, yes.

9      Q    Is this the toilet on Page 12 of one of the

10  bathrooms of the Vista Inn lobby?

11     A    It is.

12     Q    Is this the sink in that bathroom area?

13     A    It is.

14     Q    Does this show that this bathroom is being

15  maintained?

16     MR. KIM:  Objection as to form.

17     THE WITNESS:  The sinks aren't being cleaned because

18  it's not being used.

19  BY MS. ELLENBERGER:

20     Q    Okay.  This is another photo from the lobby of the

21  Vista Inn.

22     Do you see the water mark in this ceiling?

23     A    I see a water mark, but I don't know whether it's

24  from the Vista Inn or not.

25     Q    You agree with me it shows water damage in the

**EXHIBIT A**

CHRIS CROSIER, 30(B)(6) OF HAMKIM, INC. - 06/17/2021

Page 58

1    ceiling, though; right?

2         A    It does, yes.

3         Q    Is there water damage in the ceiling of the lobby

4    of the Vista Inn?

5         A    Yes.

6         Q    What is that from?

7         A    The storm event from July of 2019.

8         Q    On the interior of the bottom floor of the Vista

9    Inn there's water intrusion from a storm event?

10        A    Yes.

11        Q    What do you base that information on?

12        A    Because we never had water in the lobby before

13   until after that storm event.

14        Q    This is the sink in the kitchen of the lobby;

15   right?

16        A    It is.

17        Q    Okay.  That's backed-up sewage in the sink there;

18   right?

19        A    I do not know what that is.  It looks like water

20   to me.

21        Q    On page AmGUARD 1823 this looks like water in a

22   sink.

23        A    Yeah.  I mean, I don't know what that is.

24        Q    Mr. Crosier, would you drink out of this sink?

25        A    No.

**EXHIBIT A**

CHRIS CROSIER, 30(B)(6) OF HAMKIM, INC. - 06/17/2021

Page 59

1    Q    Is this another bathroom in the Vista Inn lobby --

2    A    Yes.

3    Q    -- on Page 16?

4    A    Yes.

5    Q    Okay.  On Page 17, this is AmGUARD 1825, is this a

6    photo of the toilet in the lobby, one of the lobby

7    bathrooms?

8    A    Yes.

9    Q    And do you see the water marks next to the toilet

10   on the left side?

11   A    No, I don't.

12   Q    Okay.  If you look at this area that I am circling

13   right here, what does that appear to be to you?

14   A    I mean, it's dirty.  Don't know whether it's a

15   water mark or not.

16   Q    Is this a maintained bathroom in the lobby of the

17   Vista Inn?

18   A    It is not.

19   Q    Here's another water mark from the ceiling of the

20   lobby of the Vista, and it's your -- is it your testimony

21   that this is also from water intrusion from a storm event?

22   A    We had no water intrusion in the Vista lobby until

23   the July of 2019 storm.

24   Q    Even when the roof was leaking in 2018?

25   A    The leak in 2018 was on the south side of the

**EXHIBIT A**

CHRIS CROSIER, 30(B)(6) OF HAMKIM, INC. - 06/17/2021

Page 60

1    building.

2         Q    Which is -- which area is this?

3         A    This is the north side of the building.

4         Q    This is the carpet of the lobby.  Do you see the

5    water damage to this carpet?

6         A    I do see the water damage to the carpet.

7         Q    And this is amGUARD 1827.

8         When was the first time you noticed this water damage?

9         A    I don't know.

10        Q    Here is some more water, what appears to be water

11   damage on the floor of the lobby of the Vista.

12        When was the first time you saw this water damage?

13        A    I don't recall.

14        Q    Is this the security -- I call it the security

15   room.  I don't know what you guys call it, but is this a

16   security room in the Vista Inn lobby?

17        A    It is.

18        Q    And this is Page 21.

19        On Page 22 is this the floor of that security room

20   area?

21        A    It appears to be.

22        Q    That is amGUARD 1830.  I know it's hard to see

23   Page 22 of this exhibit.

24        Do you know what this is right here that my -- this

25   marking here?

**EXHIBIT A**

CHRIS CROSIER, 30(B)(6) OF HAMKIM, INC. - 06/17/2021

Page 61

```
1      A    I don't have any idea.

2      Q    Does this show this area has been maintained?

3      A    It does not.

4      Q    This is another photo of the lobby -- I am

5  sorry -- of the security room.  Can we call it the security

6  room?  I don't know what you guys call it.

7      A    We just call it the manager's office, but, yes,

8  that's fine.

9      Q    Is this your office?

10     A    No, ma'am.

11     Q    Whose office is this?

12     A    We don't have a manager for the Vista Inn yet.

13     Q    How many rooms at the Vista Inn are occupied

14  today?

15     A    I do not know that answer.

16     Q    Less than half?

17     A    I need to -- I -- I don't know.

18     Q    How many rooms are ready to be occupied or ready

19  to be used as hotel rooms in the Vista Inn today?

20     A    I do not know.

21     Q    Here's another photo of the ceiling of the lobby

22  of the Vista.

23          You see those water markings there?

24     A    I do.

25     Q    What is that blue tape there for?
```

**EXHIBIT A**

CHRIS CROSIER, 30(B)(6) OF HAMKIM, INC. - 06/17/2021

Page 62

1       A    I think that's been there as long as I can recall.

2   So must have been when they painted the office years ago.  I

3   am only speculating, but it's been there as long as I can

4   remember.

5       Q    What does this photo show on Page 25, AamGUARD

6   1833?

7       A    That's our fire alarm panel.

8       Q    When were these installed?

9       A    I -- we did not do that.  So I don't know.

10      Q    Meaning it was done prior to the purchase in

11  February of 2017?

12      A    Correct.

13      Q    Do you see this photo of the carpet that shows --

14      A    I do.

15      Q    -- water damage on the carpet of the lobby?

16      A    Yes, I do.

17      Q    Do you know what this water damage was caused by?

18      A    The only time we ever had any damage in there was

19  from when the roof leaked.

20      Q    When the roof leaked in 2017 prior to being --

21      A    No.  From -- I am sorry.  When the roof leaked in

22  July of 2019.

23      Q    So it's your testimony that this -- this condition

24  did not exist prior to July of 2019?

25      A    Correct.

**EXHIBIT A**

CHRIS CROSIER, 30(B)(6) OF HAMKIM, INC. - 06/17/2021

Page 63

1    Q    It was a functional lobby.

2    Q    But it wasn't functioning as a lobby; right?

3    A    We did actually use it as a lobby until probably

4    August or September of 2019.

5    Q    Starting when?

6    A    I would have to go back and figure that out, but I

7    know it was a functional lobby.

8    Q    Okay.  I am just going to switch back over to this

9    Exhibit 3, which is the survey report.  In the survey report

10   it says "The office of The Great Stay Inn is still under

11   renovation, so guests are directed to the Clarion for check-

12   in."

13        Do you see where I read that?

14   A    I do.

15   Q    So was -- is it still your testimony that the

16   lobby of The Great Stay Inn was ready for -- to be used for

17   guests as a check-in place in 2017?

18   A    It was.

19   Q    So this statement is inaccurate?

20   A    It is.  One of the things that I was brought in to

21   do in April -- one of the first things I did in April of

22   2017 was to set up computers and phones back there in -- so

23   that they could use them.  So we had people back there.

24   They just weren't being efficient.  So I don't know why that

25   statement was made.

**EXHIBIT A**

CHRIS CROSIER, 30(B)(6) OF HAMKIM, INC. - 06/17/2021

Page 64

1        Q     Was a continental breakfast ever offered at the

2    Vista Inn?

3        A     It was up until I killed it in 2018.

4        Q     Why?

5        A     Cost.

6        Q     Were you managing the Vista Inn in 2018?

7        A     Yes.  When I became the general manager I was.

8        Q     So you said that there's no manager for the Vista

9    Inn today?

10       A     I oversee both hotels.  There is not a dedicated

11   manager to clarify.

12       Q     Thank you.  Okay.

13             Underneath the -- let me just get through these photos.

14   Okay.  So that was one.  I am back on Exhibit No. 4 now.

15   Okay.  Back to the photos of the lobby, we went over this

16   Page 27, AmGUARD 1835 showing water damage to the floor;

17   right?

18       A     Correct.

19       Q     Does this show that the lobby area of the Vista

20   Inn is being maintained?

21       A     No.  It does not.

22       Q     What is this a photo of in the lobby?  What is

23   this?

24       A     That's one of the heating and air-conditioning

25   units of the lobby.

**EXHIBIT A**

CHRIS CROSIER, 30(B)(6) OF HAMKIM, INC. - 06/17/2021

Page 65

```
1      Q    Is this operational?

2      A    It is.

3      Q    Okay.  And that's Page 1836 and Page 28 of the

4  exhibit.  This is another photo from that area of the lobby.

5  Not entirely sure what this is.

6      Do you recognize what this is a photo of?

7      A    I do not.

8      Q    Okay.  Does this show that this area of the lobby

9  is being maintained?

10     A    It does not.

11     Q    Okay.  Back to Exhibit No. 3, the package policy

12 survey report from April 13th, 2017.  It says "Projects for

13 upgrade."

14     And these are representations that are being made by

15 HamKim, Inc., to the insurance carrier; right?

16     MR. KIM:  Objection as to form.

17     THE WITNESS:  Can you repeat that?

18 BY MS. ELLENBERGER:

19     Q    Yes.

20     So this is -- these are notes from an interview made to

21 an AmGUARD representative, the insurance company, by HamKim,

22 Inc.'s, representatives; right?

23     MR. KIM:  Objection as to form.

24     THE WITNESS:  I wasn't there for those statements.

25                    * * * * * *
```

**EXHIBIT A**

CHRIS CROSIER, 30(B)(6) OF HAMKIM, INC. - 06/17/2021

Page 66

1   BY MS. ELLENBERGER:

2       Q    Okay.  In April of 2017 when you came in, was the

3   park -- did the parking lot of the Vista have large potholes

4   and cracks?

5       A    I can't recall.

6       Q    Did you or anyone else, you meaning HamKim, Inc.,

7   make arrangements to have the pavement resurfaced?

8       A    I do not know how it was done.  I do recall seeing

9   the pictures after it was completed.

10      Q    What was completed?

11      A    The parking lot repairs of large potholes and

12  cracks.

13      Q    Okay.  So it's your understanding that there were

14  repairs made to the parking lot?

15      A    Absolutely.  Yeah.  I saw the pictures of that.

16      Q    It goes on to say that there is loose carpeting on

17  stairs, and this will soon be replaced with rubber stairs.

18           Did the Vista have rubber stairs installed?

19      A    No.  We did replace the carpeting on the stairs.

20  I remember talking to the maintenance people about that.

21      Q    Tell me about that.

22      A    Charles Howard came to me and said "Hey, by the

23  way, we can rip up the carpeting on there and get it

24  replaced."  So we did just that.

25      Q    And did you do -- did HamKim do that of its own

**EXHIBIT A**

CHRIS CROSIER, 30(B)(6) OF HAMKIM, INC. - 06/17/2021

Page 67

1   volition, or was it asked to do so by the insurance company?

2       A     I believe it was asked by the insurance carrier

3   after seeing all the documentation.  At that point I was

4   just -- we were told to replace it, so I made sure it was

5   done.

6       Q     Okay.  And then down here at the very last bullet

7   point it says "The roof is leaking.  There are plans to have

8   it repaired or recoated."

9       Do you see where I read that?

10      A     I do.

11      Q     Is it fair to say as of April 3rd, 2017,

12  AmGUARD -- I am sorry -- HamKim knew the roof was leaking

13  and that it needed to be repaired or recoated?

14      A     Correct.

15      Q     Is there a workout room in the Vista Inn?

16      A     That's what they called it.

17      Q     Tell me more about that.

18      A     Okay.  So the lobby -- when the lobby was formed

19  in 2007 when it became a Howard Johnson, it was formed out

20  of three rooms what used to be, you know, three guest rooms.

21  So during the Howard Johnson upbringing, if you are looking

22  at the Vista Inn, the very first room to your right is the

23  lobby where you see the desk.  Actually, there's four -- no.

24  There's three -- I am sorry.  The first is the lobby and

25  desk, the next one was the breakfast area, and the last one

**EXHIBIT A**

CHRIS CROSIER, 30(B)(6) OF HAMKIM, INC. - 06/17/2021

Page 143

1    question.

2        MS. ELLENBERGER:  This is going to be Exhibit No. 16.

3    This is an e-mail.

4        (Deposition Exhibit 16 was marked.)

5    BY MS. ELLENBERGER:

6        Q    It's an e-mail dated October 3rd, 2019.  Okay.

7    Are you able to see this document?

8        A    Yes.

9        Q    Okay.  It looks like -- I'm just going to go to

10   the bottom to make sure we get a full picture of this.

11   Okay.  Okay.  This looks like it's an e-mail chain that was

12   originated back in October -- or August 20th of 2019 from

13   you to Jeff Taylor regarding the Vista roof claim.

14       Do you see where I am reading that at the bottom?

15       A    I do.

16       Q    Okay.  And then there's some back and forth, and

17   then we see this e-mail from you to Mr. Taylor on October

18   1st, 2019, asking if you had heard anything -- if they heard

19   anything from the engineers; right?

20       A    Correct.

21       Q    Okay.  And then on October 2nd, 2019, about 24

22   hours later, Mr. Taylor gets back to you, and he says "I

23   received the engineering report last night.  Based on the

24   report, it appears there will be no coverage for this claim.

25   All is subject to -- all is subject to review and

**EXHIBIT A**

CHRIS CROSIER, 30(B)(6) OF HAMKIM, INC. - 06/17/2021

Page 144

1    determination of the carrier.  I will forward the

2    engineering report to the insurance carrier.  If approved, I

3    will forward for your review.  Please contact me if you have

4    any questions."

5         You say "Can you forward a copy to me?"

6         And Mr. Taylor responds just, again, within a day.  He

7    said on October 3rd, 2019, copying you and Mr. Dupre.  He

8    says "Sorry.  Here is the estimate.  After further review,

9    they did not find possible hail damage -- they did find

10   possible hail damage to the stucco caps on the parapet

11   walls.  Here is our estimate for those repairs.  Please

12   advise if you can complete for these costs or submit a

13   comparative estimate for our review."

14        Did you ever advise whether you could complete these

15   repairs for those costs?

16   A    Say it again.

17   Q    Did you ever -- it says right here "Please advise

18   if you can complete for these costs or submit a comparative

19   estimate for our review."

20        Did you ever do either one of those?

21   A    I don't recall.

22   Q    You didn't; right?

23   A    I don't recall.

24   Q    AmGUARD invited you to dispute their conclusions,

25   and you never did that either, did you --

**EXHIBIT A**

CHRIS CROSIER, 30(B)(6) OF HAMKIM, INC. - 06/17/2021

Page 145

1      MR. KIM:  Objection.

2  BY MS. ELLENBERGER:

3      Q    -- other than filing a lawsuit?

4      MR. KIM:  Objection as to form.

5      THE WITNESS:  I don't -- I honestly don't recall what

6  the next steps were.

7  BY MS. ELLENBERGER:

8      Q    Who would know that?  Since you're the corporate

9  representative for HamKim, Inc., who would be the right

10 person to ask?

11     A    It would be me, but, like I said, I don't recall

12 what the next steps were.

13     Q    Okay.  Do you remember receiving this estimate

14 from Mr. Taylor on October 3rd, 2019, telling you that --

15 informing you that there is little coverage with respect to

16 this claim; right?

17     MR. KIM:  Objection as to form.

18     THE WITNESS:  Say that again, please.

19 BY MS. ELLENBERGER:

20     Q    Do you remember -- it looks like you're copied on

21 this e-mail; right?  Do you dispute that you received this

22 e-mail on October 3rd, 2019?

23     A    I do not dispute I got the e-mail.

24     Q    Okay.  After he -- after Mr. Taylor told you that

25 based on the report it appears that there -- that there will

**EXHIBIT A**

CHRIS CROSIER, 30(B)(6) OF HAMKIM, INC. - 06/17/2021

Page 146

1  be no or limited coverage for this claim, what did you do

2  then?

3      A    I told him to forward a copy to me.

4      Q    Okay.  Once you got a copy of the estimate, what

5  did you do then?

6      A    I hadn't gotten a copy at that time.  He even said

7  the engineering report will follow.

8      Q    Here's the estimate.  It was attached to that

9  e-mail.  So once you got this documentation, what did you do

10  then?

11      A    It was probably -- I don't recall.  I mean, I am

12  thinking about it.  I don't recall what I did next.

13      Q    You didn't send anything to AmGUARD saying "We

14  don't agree with this decision," did you?

15      A    I don't know if we ever did that or not.

16      Q    Who would know that, sir, since you are the

17  corporate representative for HamKim, Inc.?

18      A    It would be me, and I just don't -- I don't recall

19  the chain of events.

20      Q    Okay.  What documents could you show or would you

21  have that would refresh your recollection as to what the

22  chain of events was?

23      A    It's a good question.  I mean, I don't think I

24  agreed with their assessment.

25      Q    On what basis?  Did you have a conversation with

**EXHIBIT A**

CHRIS CROSIER, 30(B)(6) OF HAMKIM, INC. - 06/17/2021

1  Mr. Dupre, and he told you that it was wrong?

2      A    I may have.

3      Q    Did he urge you to file -- to find an attorney and

4  file a lawsuit?

5      A    I don't believe we ever had that conversation.

6      Q    Okay.  What conversations did you have with

7  Mr. Dupre following receipt of this estimate?

8      A    That's a really good question.  I don't -- did

9  we -- I don't recall what -- I know at some point I had a

10  conversation with Mr. Dupre about what -- I don't -- "This

11  is not right.  What do we do about it?"  I don't recall when

12  that was.

13      Q    Okay.  What else did you discuss with Mr. Dupre?

14      A    I just -- I think I told him I didn't agree with

15  everybody's assessment, and I believe I kind of left the

16  ball in their court to, you know, do the next steps and

17  figure out where we are and what we had to do.

18      Q    The ball in whose court?

19      A    Scott's.

20      Q    So what does that mean?  What was Scott to do?

21      A    I think Scott was supposed -- I mean, I think he

22  came out -- like I said, he looked at the roof.  We had his

23  professional opinion on it, and I just don't recall the

24  whole chain of events and how it all went down.

25      Q    Did Scott refer you to Mr. Kim's office?

**EXHIBIT A**

CHRIS CROSIER, 30(B)(6) OF HAMKIM, INC. - 06/17/2021

Page 148

1    A    He did.

2        Q    Did Scott also refer you to Bill Watterud --

3    Watterud?

4    A    Yeah.  I can't say his last name either.  I don't

5    how he -- Scott was referred to us.

6        Q    I am sorry.  I --

7    A    I don't know how -- I don't know where Scott came

8    from.  I don't know.  It wasn't somebody I knew.  So we was

9    referred to him.  I just don't know by whom.

10       Q    Okay.  Why did you retain a public insurance

11   adjuster?

12   A    Because we didn't -- we didn't believe what the

13   insurance carrier's adjusters had given us.

14       Q    Okay.  Did you submit anything to AmGUARD to tell

15   it that you were disputing -- to put it on notification that

16   you were disputing the determination of this claim prior to

17   filing the lawsuit?

18   A    I don't believe we did.

19       Q    Why not?

20   A    I don't know.  I honestly just don't know.

21       Q    Okay.  Instead you retained a public insurance

22   adjuster; right?

23   A    Correct.

24       Q    At the recommendation or not the recommendation of

25   Mr. Dupre?  I don't know where we came out on that.

**EXHIBIT A**

CHRIS CROSIER, 30(B)(6) OF HAMKIM, INC. - 06/17/2021

Page 150

 1   some water.

 2       MR. KIM:  Sure.

 3       (Short break taken.)

 4       MS. ELLENBERGER:  We can go back on the record.

 5   BY MS. ELLENBERGER:

 6       Q    Mr. Crosier, you understand you are still under

 7   oath?

 8       A    I do.  I do.

 9       Q    Perfect.  I am going to share with you what's

10   been -- what will be marked as Exhibit 16.

11       (Discussion held off the record.)

12       MS. ELLENBERGER:  Let's try this again.  Exhibit 17.

13       (Deposition Exhibit 17 was marked.)

14   BY MS. ELLENBERGER:

15       Q    Okay.  Are you able to see this document?  Yes,

16   you are able to see this?

17       A    Yes.  I am sorry.  I am sorry.  My bad.

18       Q    So prior to the break -- prior to the break we had

19   discussed that on October 3rd you had received an e-mail

20   from Jeff Taylor informing you that there is little to no

21   coverage afforded under the policy for the claim that HamKim

22   had made; right?

23       A    Correct.

24       Q    Okay.  This is an e-mail -- this is an e-mail

25   dated Tuesday, January 14th, 2020, at 9:09 a.m. from Bill

**EXHIBIT A**

CHRIS CROSIER, 30(B)(6) OF HAMKIM, INC. - 06/17/2021

Page 151

```
 1   Ardoline.
 2       Do you know who that is?
 3       A   Okay.  I do.
 4       Q   Okay.  Bill Ardoline was the adjuster on this
 5   claim from AmGUARD; right?
 6       A   Correct.
 7       Q   Okay.  And then it's -- oh, geez.  It's sent to
 8   bwaterudd@insuranceadjustersgroup.com.
 9       Do you know who that is?
10       A   Bill Watterud, yeah.
11       Q   Okay.  And it says -- it copies Jeff Taylor and
12   Anthony Bartoli, and then it says "Hello Bill, please see
13   the package of information sent yesterday on this claim."
14   Okay.  And then -- and then there is a determination letter
15   dated January 13th of 2020.
16       Do you see that?
17       A   I do.
18       Q   Did you review this determination letter prior to
19   your deposition today?
20       A   No, not prior to today.
21       Q   You've never seen this letter before?
22       A   I have seen it, yes.
23       Q   Okay.  When before today have you seen it?
24       A   I don't recall exactly when I have seen it, but I
25   have seen it.
```

**EXHIBIT A**

CHRIS CROSIER, 30(B)(6) OF HAMKIM, INC. - 06/17/2021

Page 152

1    Q    Okay.  Was it in January of 2020?

2    A    That's reasonable.

3    Q    Prior to filing the lawsuit?

4    A    I don't know exactly when the lawsuit was filed

5    off the top of my head.

6    Q    I'll represent to you that the initial Complaint

7    was filed in April of 2020.

8    A    Okay.

9    Q    Okay.  Did you see this document prior to the

10   filing of the lawsuit against AmGUARD?

11   A    Yes.

12   Q    Okay.  And, again, dated January 13th, 2020.  Do

13   you want to review it, the letter?  I don't want to read the

14   entire thing, but I can go through.  Basically on the

15   initial paragraph says "The undersigned represents the

16   interests of Amguard Insurance Company relative to the above

17   referenced claim, receipt of which being hereby acknowledged

18   AmGUARD received notice of the claim on July 23rd 2019.  You

19   have reported interior water damage due to exterior building

20   damage caused by a recent thunder and rainstorm."

21        Do you see where I read that?

22   A    I do.

23   Q    Okay.  And did you make that report of interior

24   water damage due to exterior building damage caused by a

25   recent thunder and rainstorm?

**EXHIBIT A**

CHRIS CROSIER, 30(B)(6) OF HAMKIM, INC. - 06/17/2021

Page 153

1       A     Yes.

2       Q     Okay.  The second paragraph states "This letter is

3   to advise you that based upon careful review of the facts

4   surrounding this loss and the terms, conditions,

5   limitations, exclusions and/or endorsements of the policy,

6   we have concluded that there is partially no coverage

7   afforded to HamKim, Inc., under the AmGUARD policy for the

8   damages asserted.  Accordingly for reasons set forth in

9   greater detail below, AmGUARD Insurance Company respectfully

10  disclaims any duty to indemnify any (named insured) for

11  claims related to this loss."

12        Do you see where I read that?

13      A     I do.

14      Q     Okay.

15        (Interruption in proceedings.)

16  BY MS. ELLENBERGER:

17      Q     I am just going to ask a couple quick questions

18  again that we had gone through.  So, Mr. Crosier, before we

19  lost the court reporter due to technology issues and part of

20  the questioning that she missed due to those technology

21  issues, I asked you if you reviewed this termination letter

22  dated January 13th, 2020, marked as Exhibit 17 prior to

23  filling the lawsuit on April 1st of 2020.

24      A     I did.

25      Q     Okay.

**EXHIBIT A**

CHRIS CROSIER, 30(B)(6) OF HAMKIM, INC. - 06/17/2021

Page 154

1          MS. ELLENBERGER:  That's really all we missed,

2     Christian.

3     BY MS. ELLENBERGER:

4          Q    Mr. Crosier, are you able to see this document

5     still?

6          A    I am.

7          Q    Okay.  This is still Exhibit No. 17, and I had

8     read -- well, geez.  I had read that there was partially no

9     coverage afforded to HamKim, Inc., under the policies for

10    the damages asserted.

11         Remember that?

12         A    I do.

13         Q    Okay.  And then the letter goes on to say under

14    the claim section you, your contractor, and your public

15    adjuster had recorded that the building roof and stucco caps

16    on the parapet walls were damaged by wind.  The wind created

17    openings on the stucco caps, then allowed water to enter the

18    roof below and the anterior -- or I'm sorry -- enter the

19    building roof and the interior below.  That was the claim

20    that you and your contractor, Scott Dupre, and your public

21    adjuster, Bill Watterud, made; right?

22         A    Correct.

23         Q    Okay.  And then AmGUARD goes on to state what the

24    policy says.  The policy is from February 23rd, 2019, to

25    February 23rd, 2020; right?

**EXHIBIT A**

CHRIS CROSIER, 30(B)(6) OF HAMKIM, INC. - 06/17/2021

Page 155

1    A    Sounds reasonable.

2    Q    Okay.  And you understood that when you entered

3  into a contract by purchasing the policy from AmGUARD that

4  you were subject to the terms and conditions contained in

5  that policy; right?

6    A    I don't know if anybody reads the entire insurance

7  policy when they get it from top to bottom.

8    Q    Okay.  But you understood that the policy defined

9  AmGUARD's obligation and HamKim's obligation with respect to

10  this insurance policy; right?

11    MR. KIM:  Objection as to form.

12    THE WITNESS:  I am sorry.  Try it one more time,

13  please.

14  BY MS. ELLENBERGER:

15    Q    Yeah.

16    You purchased an insurance policy from AmGUARD; right?

17    A    Correct.

18    Q    And by doing so, you agreed to be bound by the

19  terms and conditions contained therein; correct?

20    A    Correct.

21    Q    Okay.  I am going to just pull from the relevant

22  section -- sorry.  This determination letter, quote, from

23  relevant section of the policy.  Specifically with respect

24  to Section 1, property under numeral -- sorry -- under

25  subheading A it says "We will pay for," we meaning AmGUARD,

**EXHIBIT A**

CHRIS CROSIER, 30(B)(6) OF HAMKIM, INC. - 06/17/2021

Page 156

```
1    "will pay for direct loss -- will pay for direct physical

2    loss of or damage to covered property at the premises

3    described in the declaration caused by or resulting from any

4    covered cause of loss."

5         Do you see where I read that?

6    A    I do.

7    Q    Okay.  So the building that we're talking about,

8    the Vista Inn building, was the property that you alleged to

9    be damaged in this hail and wind event; right?

10   A    Correct.

11   Q    Then under exclusions for covered properties or

12   for covered loss it states "We will not pay for loss or

13   damage caused by or resulting from any of the following,"

14   and it goes on to say other types of loss "No. 1, wear or

15   tear.  No. 2, rust or other corrosion, decay, deterioration,

16   hidden or latent defects or any quality of property that

17   causes it to damage or destroy itself, and No. 4, settling,

18   cracking, shrinking, or expansion."

19        Do you see where I read that?

20   A    I do.

21   Q    Okay.  And then it says under another exclusion

22   under P "Continuous or repeated seepage or leakage of water.

23        You would agree with me that Vista Inn suffered from

24   continuous or repeated seepage or leakage of water; right?

25        MR. KIM:  Objection as to form.
```

**EXHIBIT A**

CHRIS CROSIER, 30(B)(6) OF HAMKIM, INC. - 06/17/2021

Page 157

1        THE WITNESS:  I do not agree on the continuous leakage

2   as you stated.

3   BY MS. ELLENBERGER:

4        Q    How about repeated leakage?  You would agree with

5   me that the property has suffered from water intrusion in

6   2017, 2018, and then in 2019; right?

7        A    Correct.

8        Q    Okay.  No. 3 -- oh, geez.  No. 3 says "We will not

9   pay for any loss" -- or I am sorry -- "We will not pay for

10  loss or damage caused by or resulting from any of the

11  following Paragraphs A through C, but if any excluded

12  loss -- but if any excluded cause of loss that is listed in

13  Paragraph A through C results in a covered cause of loss, we

14  will pay for the loss or damage caused by that covered loss,

15  cause of loss."  That is a mouthful.  Okay.  Letter C

16  underneath that explanation says "We will not pay for

17  faulty, inadequate, defective or loss" -- hold on -- "We

18  will not pay for loss or damage caused by negligent work,

19  faulty, inadequate or defective design, specifications,

20  workmanship, repair, construction renovation, remodeling,

21  grading, or compaction."

22        Do you see where I read that?

23        A    I do.

24        Q    Okay.  So was it your understanding when you

25  entered into this policy with AmGUARD that AmGUARD would not

**EXHIBIT A**

CHRIS CROSIER, 30(B)(6) OF HAMKIM, INC. - 06/17/2021

Page 158

1   pay for loss or damage caused by or resulting from negligent

2   work, including repair, shoddy workmanship, and repair work;

3   right?

4        MR. KIM:  Objection as to form.

5        THE WITNESS:  I don't know how to answer that.  I guess

6   ask -- can you ask it again, please.

7   BY MS. ELLENBERGER:

8        Q    Yeah.

9        You understand that this was an exclusion under the

10  policy that you had purchased from AmGUARD; right?

11       A    I understand that the policy says there's an

12  exclusion, yes.

13       Q    You understand that you were bound by the

14  exclusion that form a part of the policy that you purchased

15  from AmGUARD; right?

16       MR. KIM:  Objection as to form.

17       THE WITNESS:  Okay.

18  BY MS. ELLENBERGER:

19       Q    Okay.  I'm on Page 4 now of this same document,

20  Exhibit No. 17, and in the middle of this page you will see

21  where I've highlighted "Our joint investigation with Jeff

22  Taylor of Sedgwick and Matt Sitzmann, PE, with HAAG

23  Engineering, has revealed there to be partially no coverage

24  for this loss."

25       You agree that Jeff Taylor's inspection took place on

**EXHIBIT A**

CHRIS CROSIER, 30(B)(6) OF HAMKIM, INC. - 06/17/2021

Page 159

1   July 31st, 2019; right?

2       A    Correct.

3       Q    And then Mr. Sitzmann, again -- or Mr. Sitzmann

4   further inspected the property in a further investigation of

5   this claim on September 3rd, 2019; right?

6       A    Correct.

7       Q    Okay.  And you agree that Mr. Sitzmann concluded

8   that the property has been struck by multiple hail storms

9   over a number of years?  That's a true statement; right?

10      MR. KIM:  Objection as to form.

11      THE WITNESS:  I don't know how many times it's been hit

12  by hail, to be honest with you.

13  BY MS. ELLENBERGER:

14      Q    Okay.  Do you know whether or not the BUR roofing

15  system was damaged by hail?

16      A    I have -- I have no idea what -- the roof was

17  damaged on the storm on the 20th of July.

18      Q    How?

19      A    By hail and wind and rain and God amounts of rain.

20      Q    The roof was damaged by rain?

21      A    Well, I guess saying rain damage is not accurate,

22  but the hail and the wind from that event caused the rain

23  to -- the water to seep into the building.

24      Q    Okay.  So fair to say that you and I are not

25  really experts on the causation of water damage to a

**EXHIBIT A**

Page 160

1   property; right?

2       A    Correct.

3       Q    Okay.  But Mr. Sitzmann is such an expert; right?

4       MR. KIM:  Objection to form.

5       THE WITNESS:  I don't know one from the other.  So, I

6   mean, he is what he does.  So, I mean, I don't -- I am not

7   familiar with that field.

8   BY MS. ELLENBERGER:

9       Q    Okay.  No. 5, Mr. Sitzmann -- one of

10  Mr. Sitzmann's conclusions was that a hail -- that hail

11  fractured the stucco finish on the top of the parapet.

12      Do you know what that means?

13      A    That hail damaged the top of the parapets.

14      Q    And that effect of hail on the stucco can be

15  repaired by refinishing the affected parapet.

16      Do you see where I read that?

17      A    I do.

18      Q    So Mr. Sitzmann is concluding that, in fact, the

19  hail did damage the top of these parapets, and that the --

20  that the stucco can be repaired by refinishing the parapet.

21      Do you see where I read that?

22      A    I do.

23      Q    Okay.  No. 7, "Water intrusion was likely

24  associated with leakage past imperfections in the roofing

25  system associated with construction or age."

**EXHIBIT A**

CHRIS CROSIER, 30(B)(6) OF HAMKIM, INC. - 06/17/2021

Page 161

```
1         Do you see where I read that?

2         A    I do.

3         Q    Okay.  So an expert has now concluded that

4    water -- that the water intrusion damage that -- there's not

5    really a dispute that the building suffered from water

6    intrusion following this event.  Mr. Sitzmann, however,

7    concludes that the water intrusion was likely associated

8    with leakage, past imperfections in the roofing system

9    associated with construction or age.

10        You don't have any information to dispute that; right?

11        MR. KIM:  Objection as to form.

12        THE WITNESS:  There was no water intrusion before that

13   storm in the days and weeks preceding it.  So I don't agree

14   with it.

15   BY MS. ELLENBERGER:

16        Q    Based on your experience as --

17        A    An individual who could see water coming through

18   the roof of a hotel room.

19        Q    Okay.  And then this letter goes on.  Sorry.  I

20   made it small.

21        So AmGUARD goes on to say that "Per the above, an

22   undisputed payment has been made to consider the damage

23   directly related to the reported occurrence.  The breakdown

24   is represented below," and it's on the next page.  So that

25   breakdown is there was $5,914.88 of damage, worth of damage,
```

**EXHIBIT A**

CHRIS CROSIER, 30(B)(6) OF HAMKIM, INC. - 06/17/2021

Page 162

1   allocated to -- that could be caused -- that Sitzmann

2   determined was caused by this storm event, and then there's

3   a deduction for a deductible of $5,000, and then a check was

4   indeed issued for $914.88; right?

5        A    Correct.

6        Q    What did you do with the check when you received

7   it?

8        A    Nothing.

9        Q    Where is the check now?

10       A    In the hands of my lawyers.

11       Q    Okay.  So after you received this letter on

12  January 13th of 2020 and then the check on January 14th --

13  that was dated January 14th of 2020 -- let me just bring

14  that up to make sure that we have the right thing.  I see

15  this check was actually sent to Insurance Adjusters Group,

16  LLC.  This is Exhibit 18.  It's a check for $914.88.

17       Is this the check that we were just talking about,

18  Mr. Crosier, that is held in the hands of your attorney?

19       A    I believe so, yes.

20       (Deposition Exhibit 18 was marked.)

21  BY MS. ELLENBERGER:

22       Q    Why didn't you cash it?

23       A    I am sorry?

24       Q    Why didn't you cash the check when you received

25  it?

**EXHIBIT A**